**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MURTAZA ALI,                              )
                                          )
              Plaintiff,         )
                                          )
vs.                                       )     Case No. 07-CV-059-TCK-TLW
                                          )
WALTER DINWIDDIE, Warden, DCCC;           )
et al.,                                   )
                                          )
           Defendants.             )

## OPINION AND ORDER

This is a 42 U.S.C. § 1983 civil rights action.  Plaintiff is a state inmate and appears *pro se*. In a previous order (Dkt. # 57), the Court denied Plaintiff's motion to amend his complaint and granted Defendants' motion to dismiss/summary judgment. Plaintiff appealed. On August 27, 2008, the Tenth Circuit Court of Appeals reversed this Court's denial of Plaintiff's motion to amend his complaint and remanded the case for further proceedings. See Dkt. # 74.  On September 26, 2008, after receiving leave of Court, Plaintiff filed his amended complaint (Dkt. # 88).

In the amended complaint, Plaintiff alleges that while he was incarcerated at Mack Alford Correctional Center ("MACC"), several constitutional violations occurred during and after a November 24, 2005, incident. See Dkt. # 88. He also claims that additional constitutional violations occurred following his transfer to Dick Conner Correctional Center ("DCCC"). Id. He identifies sixteen (16) defendants and states that they "are sued in their individual and official capacities." Id. Plaintiff seeks an injunction, a declaratory judgment, nominal and compensatory damages, costs and "any other relief this Court deems equitable and just."  See id. at 12.  He further states that he seeks nominal and compensatory damages from defendants in their individual capacities and declaratory relief from defendants in the official capacities. Id.

Presently before the Court are the following motions: Defendants' motion for summary judgment (Dkt. # 98), Plaintiff's motion for summary judgment (Dkt. # 110), Plaintiff's motion to lift stay of discovery (Dkt. # 116), and Plaintiff's motion for judicial notice (Dkt. # 120). Defendants submitted a Special Report (Dkt. # 26), and a supplemental Special Report (Dkt. ## 99, 100), as directed by the Court.  For the reasons discussed below, the Court finds that Defendants' motion for summary judgment shall be granted (Dkt. # 98) and Plaintiff's motion to lift stay of discovery (Dkt. # 116) shall be denied.  Plaintiff's motion for summary judgment and motion for judicial notice shall be declared moot (Dkt. ## 110 and 120).

## *BACKGROUND*

The event underlying Plaintiff's claims occurred on November 24, 2005, while he was incarcerated at MACC. In an "Incident/Staff Report," see Dkt. # 26, Ex. 2, attachment 3, MACC correctional officer Mathew Hampton wrote that on that date, he entered cell 218 to investigate an odor coming from the cell. He observed that Plaintiff had slurred speech.  Id. Defendant Hampton asked Plaintiff to step out of the cell. Id. While Defendant Hampton was "pat searching" Plaintiff, a small plastic baggie containing four (4) blue pills fell to the floor. Id. As Hampton knelt down to pick up the baggie, Plaintiff's right shoulder struck Hampton's left shoulder, knocking the correctional officer back. Id. Defendant Hampton responded by using his arm to push Plaintiff away and handcuffing him. Id. Plaintiff alleges that during the incident, Defendant Hampton used excessive force by striking him, pushing him against the wall, repeatedly punching him in the head, and kicking him while he was on the ground. See Dkt. # 88. Plaintiff asserts Defendant Hampton's "excessive force" caused injuries to Plaintiff's shoulder, head and back. Id.

2

After being handcuffed, Plaintiff was taken to the segregated housing unit ("SHU") where he was strip searched.  See Dkt. # 26, Ex. 2, attachment 3.  Sergeant Bourland, the correctional officer assisting Defendant Hampton, described Plaintiff as being "aggressive towards Sgt. Hampton and was disoriented and confused."  Id. Defendant Hampton and Sgt. Bourland noticed Plaintiff holding something in his right hand.  Id. Plaintiff refused an order to turn over the object in his hand, placed the object in his mouth and swallowed. Id.  Plaintiff later admitted that he had swallowed five Xanax pills. Id., at p. 10 of 10.  Plaintiff was then escorted to get medical attention where duty nurse Pugh examined him. Id., Ex. 2, attachment 4. Nurse Pugh recommended that Plaintiff be transported to the hospital for detox due to the unknown quantity of drugs he had ingested. Id. The nurse also filed a report of her examination which indicated that she did not find any significant injuries caused by the incident. Id. Plaintiff was transported to Coalgate Hospital and treated for potential drug overdose. According to Lt. Kenyon, a correctional officer who transported Plaintiff to the hospital, Plaintiff did not complain of any injuries while at the hospital. Id., attachment 3 at p. 10 of 10.

As a result of the November 24, 2005, incident, Plaintiff was charged with four (4) misconducts: Individual Disruptive Behavior, Possession of Contraband, Disobedience to Orders, and Battery. See Dkt. # 26, Ex. 2, attachment 6.  He was given written notice of the charges and a hearing was held on the merits. Id. On December 8, 2005, Plaintiff was found guilty of the disciplinary charges. See Dkt. # 26, Ex. 2, attachment 7.  He appealed the findings. Id., Ex. 3, attachment 8. The administrative appeals reviewer concurred with the facility findings on the misconducts of Individual Disruptive Behavior and Battery. However, the misconducts of Disobedience to Orders and Possession of Contraband were remanded for rehearing.  See id., Ex. 3, attachments 8-16.  Prior to the final disposition of the remanded charges, however, Plaintiff was

3

transferred to DCCC. The warden at MACC determined that it would not be feasible to spend the time and expense necessary to hold a rehearing on the charge of Disobedience to Orders. Accordingly, that misconduct was reversed and expunged from Plaintiff's record. Id., Ex. 3, attachment 14. A rehearing on the Possession of Contraband misconduct was conducted on March 20, 2006, at DCCC. Id., Ex. 6, attachment 13 at p. 10 of 10. The Disciplinary Hearing Officer determined that the evidence demonstrated that the pills found in Plaintiff's possession were Xanax and that the pills had not been prescribed to Plaintiff. Id. Plaintiff was found guilty of the offense of Possession of Contraband. Id. Plaintiff appealed to the facility head. The record reflects that the Warden's Assistant Al Blair determined that a statement from MACC identifying the blue pills as Xanax was needed and recommended that Plaintiff be provided an additional rehearing for the purpose of supplementing the evidence. The second rehearing was conducted on July 6, 2006. MACC Health Administrator Marcus Pogue provided a memorandum identifying the blue pills as Xanax. See Dkt. # 26, Ex. 6, attachment 15. Based on that evidence, Plaintiff was again found guilty of the offense. See Dkt. # 26, Ex. 5, attachment 5. Nothing in the record indicates Plaintiff appealed this finding.

Plaintiff also alleges that he has been subjected to discrimination and retaliation since his transfer to DCCC. See Dkt. # 88. He claims he was purposely denied a transfer to a minimum security facility due to a conspiracy among certain defendants who are employees at DCCC. He also claims that the retaliatory actions and conspiracies have resulted in physical harm to him in the form of beatings from other prisoners at DCCC. Id. According to Defendants, the reason Plaintiff was

4

denied a transfer to minimum security was "the gravity of the offenses."[1]  See Dkt. # 98.  Defendants

also assert that Plaintiff's claim concerning a beating at the hands of Native American inmates on

June 30, 2008, is unsubstantiated and unexhausted.  Id. at 11.

***ANALYSIS***

**A.      Defendants' motion for Summary Judgment**

      **1.      Summary judgment standard**

Entry of summary judgment, pursuant to Fed. R. Civ. P. 56, is appropriate "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show

that there is no genuine issue of material fact and that the moving party is entitled to judgment as

a matter of law."  When reviewing a motion for summary judgment, the court must view the

evidence in the light most favorable to the non-moving party.  Jiron v. City of Lakewood, 392 F.3d

410, 414 (10th Cir. 2004);  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238,

1241 (10th Cir. 1990) (citing Gray v. Phillips Petroleum Co., 858 F.2d 610, 613 (10th Cir. 1988)).

"However, the nonmoving party may not rest on its pleadings but must set forth specific facts

showing that there is a genuine issue for trial as to those dispositive matters for which it carries the

burden of proof." Applied Genetics, 912 F.2d at 1241 (citing Celotex Corp v. Catrett, 477 U.S. 317,

324 (1986)).  A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving

party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Material facts" are "facts which

---

[1]Plaintiff was originally charged with two (2) counts of First Degree Murder in Tulsa County District Court, Case No. CF-02-4910.  However, he pled guilty to two (2) counts of a reduced charge of Accessory After the Fact to Murder, First Degree.  In addition, Plaintiff has an Immigration and Customs Enforcement ("ICE") detainer, and a detainer for an eleven (11) month federal sentence entered in N.D. Okla. Case No. 03-CR-179-HDC.  See Dkt. # 99, attachment 1.  Plaintiff also has a "flash" entry on his record, indicating the existence of victim and/or public concern regarding his location.  Id.

might affect the outcome of the suit under the governing law." Id.  Although the court cannot resolve material factual disputes at summary judgment based on conflicting affidavits, Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991), the mere existence of an alleged factual dispute does not defeat an otherwise properly supported motion for summary judgment.  Anderson, 477 U.S. at 247-48. Only material factual disputes preclude summary judgment; immaterial disputes are irrelevant.  Hall, 935 F.2d at 1111.  Similarly, affidavits must be based on personal knowledge and set forth facts that would be admissible in evidence.  Id.  Conclusory or self-serving affidavits are not sufficient.  Id.; see also Salguero v. City of Clovis, 366 F.3d 1168, 1177 n. 4 (10th Cir. 2004); Murray v. City of Sapulpa, 45 F.3d 1417 (10th Cir. 1995).  The trial judge shall grant summary judgment if the evidence, viewed in the light most favorable to the non-movant, fails to show that there exists a genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see also Anderson, 477 U.S. at 250.

Where a *pro se* plaintiff is a prisoner, a court authorized "Martinez[2] Report" ("Special Report") prepared by prison officials may be necessary to aid the Court in determining possible legal bases for relief found in unartfully drawn complaints.  See Hall, 935 F.2d at 1109.  The Court may treat the Martinez Report as an affidavit in support of a motion for summary judgment, but may not accept the factual findings of the report if the Plaintiff has presented conflicting evidence.  Id. at 1111.  The Plaintiff's complaint may also be treated as an affidavit if it is sworn under penalty of perjury and states facts based on personal knowledge.  Id. The Court must also construe Plaintiff's *pro se* pleadings liberally for purposes of summary judgment.  Haines v. Kerner, 404 U.S. 519, 520

---

[2] In Martinez v. Aaron, 570 F.2d 317 (10th Cir.1978), the Tenth Circuit Court of Appeals established guidelines for the filing of a special report by the appropriate prison or jail authorities to illuminate the factual background and subject matter of prisoners' civil rights complaints.

(1972). When reviewing a motion for summary judgment it is not the court's function to weigh the evidence and determine the truth of the matter but only to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249.

### 2. Plaintiff's request for discovery

In considering Defendants' motion for summary judgment, the Court has examined the Special Report, as supplemented (Dkt. ## 26, 99, 100). The Court has also examined evidence submitted by Plaintiff (Dkt. ## 29, 30, 31, 32, 42, 44, 53, 55), including his response opposing Defendants' motion, with attached documentation (Dkt. # 109). The documents, however, do not present evidence which refutes the material facts in Defendants' motion and Special Report. Plaintiff does, however, interpret the facts differently to argue that his claims are valid. He has also filed documents purporting to contest the records supplied by Defendants in the Special Report (Dkt. ## 30, 31, 32, and 88 attachments), including affidavits of various inmates. However, the Court finds that the documents provided by Plaintiff do not present conflicting material evidence. See Hall, 935 F.2d at 1111. Therefore, the Court accepts as true the uncontroverted facts of the Special Report, as supplemented, insofar as they are related to the constitutional issues raised by Plaintiff. Id.

The Court recognizes that Plaintiff has filed a motion to lift stay of discovery (Dkt. # 116). By Order filed December 17, 2008 (Dkt. # 113), the Court determined that Plaintiff had failed to inform the Court with any degree of specificity what additional materials or information he needed to enable him to oppose Defendants' motion for summary judgment. Further, the Court found that the potential harm to Plaintiff was outweighed by the burden on Defendants resulting from conducting and responding to discovery during the pendency of Defendants' motion for summary judgment. As a result, the Court denied Plaintiff's motion to compel discovery and granted

Defendants' motion to stay discovery.  See Dkt. # 113.  In the pending motion to lift stay of discovery, Plaintiff again fails to provide, with the exception of his request for subpoenas, specific information concerning his discovery needs. See Fed. R. Civ. P. 56(f) (requiring a party to show by affidavit specified reasons for inability to present facts essential to justify opposition to motion for summary judgment).  As to his request for subpoenas, Plaintiff indicates he needs subpoenas to support his claim that he was the victim of a "HIT."  See Dkt. # 116.  However, as discussed in Part A(3)(d)(ii), below, Plaintiff has failed to exhaust administrative remedies for that claim and, as a result, the claim is dismissed. Issuance of subpoenas is unnecessary. Therefore, the Court exercises its discretion to deny Plaintiff's motion to lift discovery stay.  See Diaz v. Paul J. Kennedy Law Firm, 289 F.3d 671, 673 (10th Cir. 2002).

### 3.  Plaintiff's claims

#### a.  *Excessive use of force (Count 1)*

As part of his first claim, Plaintiff contends that Defendant Hampton used excessive force on Plaintiff during the November 24, 2005, incident at MACC. Plaintiff asserts that he was pushed, punched and kicked by Hampton. He also claims that Defendant Bowen, as Hampton's supervisor, failed to properly monitor Hampton according to DOC policy.

In a prison setting, the use of excessive force against a prisoner is analyzed under the Eighth Amendment prohibiting cruel and unusual punishment. See Whitley v. Albers, 475 U.S. 312, 319-20 (1986). "The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Id. at 319. An excessive force analysis in a prison environment is based on consideration of

8

both the prisoner's legal status and the unique interests of a penal institution. Although "convicted prisoners do not forfeit all constitutional protections by reason of the conviction and confinement in prison," this "does not mean that these rights are not subject to restrictions and limitations." <u>Bell v. Wolfish</u>, 441 U.S. 520, 545 (1979). "Maintaining institutional security and preserving internal order and discipline are essential goals" and "[p]rison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel. . . ." <u>Id.</u> at 546-47. The core judicial inquiry in determining whether a prison official used excessive force is whether force was applied in a good-faith effort to maintain or restore discipline, or whether it was applied maliciously and sadistically to cause harm. <u>Hudson v. McMillian</u>, 503 U.S.1, 2 (1992) (citing <u>Whitley</u>, 475 U.S. at 320-21). Factors that may be considered by the court include the extent of injury suffered by the inmate, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible official, and any efforts made to temper the severity of a forceful response. <u>Hudson</u>, 503 U.S. at 7.

In the case at hand, Plaintiff maintains that his treatment by Defendant Hampton during a November 24, 2005, search for illegal contraband was an unlawful or excessive use of force because Hampton maliciously punched and kicked him in the head, shoulders, and back. Defendants seek summary judgment, asserting that Defendant Hampton only used force necessary to regain control over the situation and that Plaintiff's constitutional rights were not violated during the incident. Based upon the record provided the Court by the parties, the Court concludes that, for the reasons discussed below, whatever force used by Defendant Hampton was applied in a good-faith effort to restore discipline, and was not applied maliciously or sadistically for the purpose of causing harm. <u>Hudson</u>, 503 U.S. at 2.

During the event in question, Plaintiff was an inmate at MACC. According to Plaintiff, at approximately 7 p.m. Defendant Hampton "poked his head in the cell and used racial epithet in reference to Plaintiff, 'Nine-eleven'[3] and [said] to 'Get out of [the] cell and place his Mother fucking hands on the wall.'" See Dkt. # 88 at 3. Hampton ordered Plaintiff to remove his shoes, checked them and threw them on the floor. Plaintiff then bent down to put his shoes on. Plaintiff's amended complaint version of what happened next varies from his original complaint. In his previous version he stated that he was stricken and pushed to the wall when he bent down to put on his shoes (Dkt. # 3 at 3). He now claims that he got one of his shoes on before Hampton "punched at the Plaintiff's head, grazing the head, pushing the Plaintiff into a near by wall injuring the Plaintiff's shoulder, head and back." See Dkt. # 88. Plaintiff also asserts that he was repeatedly punched to the head and was kicked while laying on the ground. Id. Notably, Plaintiff's account of the incident makes no mention of his intoxicated state, the baggie of drugs which fell from his clothing, or of Defendant Hampton's purpose in searching for illegal contraband. The omitted facts are, however, revealed in the Special Report (Dkt. ## 26, 99), and in some of the documents supplied by Plaintiff himself (Dkt. ## 1, 88, attachments).

The evaluation of Plaintiff's excessive force claim is not dependent upon a resolution of omitted or disputed facts. Both Plaintiff's submissions and the Martinez Report indicate that Defendant Hampton was conducting a pat-search of Plaintiff because he suspected illegal contraband. During the search, Plaintiff and Defendant collided, knocking the officer back. Although Plaintiff's and Defendant Hampton's version of events differ at this point, it is clear that Defendant

---

[3] In response to Defendants' first motion for summary judgment, Plaintiff claimed that the 'nine-eleven' comment was meant as a racial epithet associating the 'Arab' attacks on New York with Plaintiff (Dkt. # 29 at 2).

Hampton used physical force on Plaintiff before placing him in handcuffs. The "reasonableness" of a particular use of force must be judged from the perspective of the officer at the time and not every push or shove, even though it may later seem unnecessary, violates the Constitution. <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989). Officer Hampton perceived a need for force to maintain discipline and control after being bumped by Plaintiff, who exhibited signs of intoxication, and he made a split-second judgment about the amount of force required to bring the situation under control. There is no evidence in the record to indicate the force was maliciously or sadistically applied. Further, contrary to Plaintiff's claim of "severe" injuries, the medical examination by Nurse Pugh revealed "superficial abrasions, bruising and various contusions" to Plaintiff's head, neck and shoulder (Dkt. # 26, Part I, attachment 4).  As to Plaintiff's claim of shoulder injury, his medical records revealed that he had a pre-existing shoulder condition caused by a motor vehicle accident in 2002 that required two rods to be placed in his left shoulder. Although the altercation with Defendant Hampton may have exacerbated Plaintiff's shoulder injury, the medical records do not support his claim of a severe shoulder injury resulting from the November 24, 2005, incident. Considering the minor extent of injury suffered by Plaintiff, the need for application of force, the relationship between that need and the amount of force used, and the threat reasonably perceived by Defendant Hampton, the Court finds that Plaintiff's Eighth Amendment constitutional right to be free from cruel and unusual punishment was not violated by the actions of Defendant Hampton on November 24, 2005. <u>Hudson</u>, 503 U.S. at 7.

### b. Lack of training and monitoring of employees (part of Count 1, Count 3)

In Count 1, Plaintiff also argues that Defendant Hampton's supervisor, Defendant Bowen, "failed to properly monitor Defendant Hampton." In Count 3, he alleges that Defendants Beck,

Trammell, Dinwiddie, and Bowen, as facility heads and supervisors "are responsible for the actions of their employees." Dkt. # 88 at 5.

Insofar as Plaintiff argues in Count 1 that Defendant Bowen failed to monitor Defendant Hampton because Hampton "failed to follow the 'show of force' procedures," Plaintiff's claim fails. To make a prima facie claim for failure to train or supervise in an excessive force case, a plaintiff must demonstrate the officer(s) in question "exceeded constitutional limitations on the use of force." Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1264 (10th Cir. 2008) (quoting Carr v. Castle, 337 F.3d 1221, 1228 (10th Cir. 2003)). Since the use of force by Defendant Hampton did not exceed constitutional limitations, Plaintiff is not entitled to relief on this portion of Count 1. Id.; see also City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986).

In Count 3 of his amended complaint, Plaintiff states that Defendants Beck, Trammell, Dinwiddie and Bowen, as facility heads and supervisors of MACC and DCCC are "responsible for the actions of their employees." See Dkt. # 88 at 5. More specifically, he complains that Defendant Bowen was "never there or called as a show of force prior to any use of force" during the incident with Defendant Hampton. He claims that facility heads Beck, Trammell and Dinwiddie did not follow or enforce DOC policy during the subsequent disciplinary hearings for Plaintiff's misconduct charges. See Dkt. # 88 at 6.

To the extent Plaintiff is arguing that these defendants are liable simply because they hold supervisory positions, he is not entitled to relief.  Under § 1983, a defendant may not be held liable based on the theory of respondeat superior.  See Worrell v. Henry, 219 F.3d 1197, 1214 (10th Cir. 2000); Gagan v. Norton, 35 F.3d 1473, 1476 n.4 (10th Cir. 1994). Instead, to establish supervisory liability, a plaintiff must show that "an affirmative link exists between the [constitutional]

12

deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." Worrell, 219 F.3d at 1214 (quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988) (quotation omitted) (alternation in original)); Mitchell v. Maynard, 80 F.3d 1433, 1441 (10th Cir.1996); McClelland v. Facteau, 610 F.2d 693, 696 (10th Cir. 1979).[4] As previously determined, Plaintiff's constitutional rights were not violated by Defendant Hampton. Accordingly, Defendant Bowen is not liable for his absence from the scene of the incident as alleged by Plaintiff.

The remaining allegations in Count 3 center around the disciplinary proceedings and grievance procedures afforded Plaintiff after those proceedings and during his appeals. See Dkt. # 88 at 6-7. In his discussion of this issue, Plaintiff asserts that Defendants Golden and Sharp also were involved in the alleged violation of his constitutional rights. Although set forth under the heading "Lack of Training" (Dkt. # 88 at 5-7), these Count 3 allegations appear to be a challenge to the due process provided in his disciplinary hearings because "the facility heads did not ensure the compliance of DOC OPS." Without providing details, Plaintiff makes a conclusory allegation that their failure to ensure compliance "denied welfare and safety to Plaintiff." He also states that "all of the above mentioned defendants subjected this Plaintiff to conspiracy and bogus process of disciplinary hearings." Id. at 7. In response to Defendants' motion for summary judgment, Plaintiff attempts to explain his position further by stating this due process claim is raised to address "the

---

[4] Plaintiff acknowledges in his opposition to Defendants' motion for summary judgment that there is "no evidence that MACC officials were personally involved or supervised/directed the 'Hampton Beating.'" See Dkt. # 109 at 10. He states that his claim of superior liability was improper. Id.

issue of conspiracy by means of the defendants' past behavior; not to get additional cracks at overturning these misconducts." Dkt. # 109 at 9.

However, Plaintiff's allegations that Defendants Beck, Trammell, Dinwiddie, Bowen, Golden and Sharp violated his constitutional right to due process do not support a claim for §1983 relief. After liberally construing Plaintiff's *pro se* complaint, the Court concludes that Plaintiff cannot establish any facts in support of his claim that the DOC grievance process has deprived him of a constitutional right. Shango v. Jurich, 681 F.2d 1091 (7th Cir. 1982) (a prison grievance procedure does not require the procedural protections envisioned by the Fourteenth Amendment). "[A prison] grievance procedure is a procedural right only, it does not confer any substantive right upon the inmates. Hence, it does not give rise to a protected liberty interest requiring the procedural protections envisioned by the fourteenth amendment." Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) (quoting Azeez v. DeRobertis, 568 F.Supp. 8 (N.D. Ill. 1982)); see also Mann v. Adams, 855 F.2d 639, 640 (9th Cir. 1988) (an inmate has no legitimate claim of entitlement to a grievance procedure). Although dissatisfied with the results of the grievance procedure, Plaintiff has not established that his constitutional rights were infringed upon by the process. His complaint that all of the "above mentioned defendants subjected [him] to conspiracy and bogus process of disciplinary hearings" is without merit. The defendants involved in the process did not deprive him of a constitutional right entitling him to relief under 42 U.S.C. § 1983. Further, Plaintiff has not demonstrated that any affirmative link exists between a constitutional deprivation and these defendants' personal participation, exercise of control or direction, or failure to supervise. Worrell, 219 F.3d at 1214. Defendants are entitled to summary judgment on this issue.

### c. *Denial of proper medical care (Count 2)*

To state a § 1983 claim for a violation of a convicted prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 104 (1976). "Deliberate indifference" is defined as knowing and disregarding an excessive risk to an inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 827 (1994); see also Helling v. McKinney, 509 U.S. 25, 35-37 (1993). In Wilson v. Seiter, 501 U.S. 294 (1991), the Supreme Court clarified that the deliberate indifference standard under Estelle has two components: (1) an objective requirement that the pain or deprivation be sufficiently serious; and (2) a subjective requirement that the offending officials act with a sufficiently culpable state of mind. Id. at 298-99; Sealock v. Colorado, 218 F.3d 1205, 1209 (10th Cir. 2000). Negligence does not state a claim under § 1983 for deliberate indifference to medical needs. Hicks v. Frey, 992 F.2d 1450, 1455 (6th Cir. 1993). In addition, differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. Westlake v. Lucas, 537 F.2d 857, 860 n.5 (6th Cir. 1976).

In this case, Plaintiff has failed to meet his burden. Plaintiff claims that after being "severely beaten" by Defendant Hampton, he was taken to the segregation unit and seen by a nurse. See Dkt. # 88 at 4. Although he acknowledges that he was sent to Coalgate Medical Center, he claims he was never seen by a doctor and has suffered needlessly from his long term injury as a result of the assault by Defendant Hampton and denial of immediate medical care. Id. The records supplied by both Defendants and Plaintiff do not support his claims. By Plaintiff's own account, the incident with Defendant Hampton occurred at approximately 7:00 p.m. In the records provided by

15

Plaintiff, Nurse Pugh's report indicates that she was called to examine Plaintiff at approximately 8:50 p.m. the same day (Dkt. # 29, attachment 1). Because Plaintiff had swallowed an unknown quantity of pills, believed to be Xanax, Plaintiff was taken that same evening to the hospital for detoxification. Plaintiff has failed to provide evidence demonstrating that while receiving treatment at the hospital, he complained of or was treated for injuries sustained as a result of the force used by Defendant Hampton.  Furthermore, Plaintiff acknowledges that he received follow-up care at the prison infirmary, but claims that his subsequent repeated visits to the prison infirmary for medical assistance demonstrate deliberate indifference and lack of effort to treat his injuries. The record provided by Plaintiff, however, confirms that he was treated repeatedly by the prison medical staff and seems to refute rather than support Plaintiff's allegations of "deliberate indifference and lack of effort to treat" his injuries. See Dkt. # 88 at 4-5, and exhibits 4-8 attached.

The Tenth Circuit Court of Appeals has stated:

> To satisfy the objective component of a deliberate indifference claim arising under the Eighth Amendment, "the alleged deprivation must be 'sufficiently serious' to constitute a deprivation of constitutional dimension." Self v. Crum, 439 F.3d 1227, 1230 (10th Cir. 2006). "[T]he purpose for this requirement is to limit claims to significant, as opposed to trivial, suffering." Mata v. Saiz, 427 F.3d 745, 753 (10th Cir. 2005). Consequently, we look to the alleged injury claimed by the prisoner, and ask "whether that harm is sufficiently serious." Id.
>
> When the prisoner's Eighth Amendment claim is premised on an alleged delay in medical care, the prisoner must "show that the delay resulted in substantial harm." Oxendine v. Kaplan, 241 F.3d, 1272, 1276 (10th Cir. 2001) (internal quotation marks omitted). That "substantial harm" can be the ultimate physical injury caused by the prisoner's illness, so long as the prisoner can show that the more timely receipt of medical treatment would have minimized or prevented the harm. See Mata, 427 F.3d at 753. The "substantial harm" can also be an intermediate injury, such as the pain experienced while waiting for treatment and analgesics. Id. Although "not every twinge of pain suffered as a result of delay in medical care is actionable," when the pain experienced during the delay is substantial, the prisoner "sufficiently establishes the objective element of the deliberate indifference test." Sealock, 218 F.3d at 1210.

<u>Kikumura v. Osagie,</u> 461 F.3d 1269, 1292 (10th Cir. 2006), *overruling on other grounds recognized in* <u>Robbins v. Oklahoma</u>, 519 F.3d 1242, 1246-47 (10th Cir. 2008). In this case, there was no delay in providing medical treatment to Plaintiff on the evening of November 24, 2005. He was examined by the facility nurse shortly after the incident and taken to the hospital for detoxification treatment. As for Plaintiff's claim that his subsequent treatment at the prison infirmary shows deliberate indifference and lack of effort to treat his injuries, the Court finds that Plaintiff has not satisfied either component of the test for deliberate indifference. He has not demonstrated that any delay in medical treatment was sufficiently serious to constitute a deprivation of constitutional rights, nor has he shown that the Defendants knew of and disregarded any excessive risk to Plaintiff. Based upon the record provided by the parties, including Plaintiff, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claim of denial of medical care.

### *d. Conspiracy and Retaliation (Count 4)*

Plaintiff's fourth count in the amended complaint contains allegations that Defendants Beck, Trammell, McGee, and Hurd conspired to transfer him from MACC to DCCC to "cover-up what defendant Hampton did to Plaintiff and also to cover up their conspiracy to issue Plaintiff multiple misconducts to justify Defendant Hampton's wanton actions." <u>See</u> Dkt. # 88 at 7. He also adds new claims of conspiracy and retaliation against Defendants Falder, Pinkerton and Huffman.  The Court shall analyze Plaintiff's claims against each group of defendants.

### i. MACC defendants

In the first part of Count 4, Plaintiff argues that his transfer to DCCC was unconstitutional because it was ordered in retaliation for filing this lawsuit. He asserts that Defendants Beck, Trammell, McGee, and Hurd "conspired to harm Plaintiff's life by transferring him to DCCC." <u>See</u>

Dkt. # 88. Upon his transfer, Plaintiff was assigned to the "notorious G & J unit," where he "has witnessed several stabbings, a riot on July 14, 2005, killings on August 23, 2005 and on September 13, 2005."[5] Alleging that Unit G & J is where the most dangerous and violent inmates are housed, Plaintiff concludes that it is clearly "retaliatory action and conspiracy to harm him by keeping him on this unit." See Dkt. # 88 at 8.  Defendants assert that Plaintiff fails to support his allegations with facts, and that the transfer to DCCC was "for legitimate security concerns in accordance with DOC policy and procedures." See Dkt. # 98 at 24.

It is settled law that prison officials may not retaliate against an inmate because of the inmate's exercise of his right of access to the courts.  Green v. Johnson, 977 F.2d 1383, 1389 (10th Cir. 1992); Smith v. Maschner, 899 F.2d 940, 947 (10th Cir. 1990).  However, inmates may be transferred from one prison to another for any constitutionally permissible reason, or for no reason at all.  See Olim v. Wakinekona, 461 U.S. 238, 245-46 (1983).  Retaliation requires evidence of improper motive to survive a summary judgment motion. Anderson, 477 U.S. at 256-257; Maschner, 899 F.2d at 948 n. 4. Additionally, Plaintiff must "prove that 'but for' the retaliatory motive" he would not have been transferred. Peterson v. Shanks, 149 F.3d 1140, 1144 (10th Cir. 1998). He must allege specific facts showing retaliation because he filed a lawsuit. Frazier v. Dubois, 922 F.2d 560, 562 (10th Cir. 1990).

In this case, Plaintiff has not demonstrated that "but for" the retaliatory motive, he would not have been transferred.  Defendants have provided evidence that Plaintiff was transferred to another

---

[5] The Defendants point out that Plaintiff was not housed at DCCC until January, 2006, and could not have witnessed the 2005 events he describes. See Dkt. # 98 at 25. However, Plaintiff responds that the references to 2005 were scrivener's errors and the events he witnessed occurred in 2006. See Dkt. # 109 at 14.

medium security facility after being "involved in a spontaneous use of force against an officer at MACC." See Dkt. # 26, Ex. 5, attachment 8. The transfer documents also reflect that Plaintiff had numerous different misconduct violations while at MACC from June 23, 2005, through November 24, 2005. Id.

In response to Defendants' motion for summary judgment, Plaintiff does not controvert the evidence provided by Defendants explaining the security reasons for the transfer. He provides no evidence, other than his self-serving statements, supporting his argument that his transfer from MACC resulted from a conspiracy and the improper retaliatory motives of Defendants. The uncontroverted evidence provided by Defendants demonstrates that Plaintiff's transfer to a different facility was penologically appropriate. His claim of retaliatory transfer is speculative and illusory. No evidence supports Plaintiff's claim that his transfer was caused by improper motives. The Court finds, that based on the summary judgment record, Plaintiff has failed to demonstrate that his transfer resulted from any unconstitutional retaliatory motive by Defendants. The Court concludes, therefore, that the evidence, viewed in the light most favorable to Plaintiff, fails to show that there exists a genuine issue of material fact, and Defendants are entitled to judgment as a matter of law.

The Court further finds that Plaintiff's allegations of a conspiracy are conclusory as he has presented no evidence of an agreement or meeting of the minds among the defendants to support his conspiracy claim. "Conclusory allegations of conspiracy are insufficient to state a valid § 1983 claim." Durre v. Dempsey, 869 F.2d 543, 545 (10th Cir. 1989). Defendants are entitled to judgment on this issue.

### ii. DCCC employees

The remainder of Plaintiff's Count 4 claim addresses the new issues and new defendants added when Plaintiff amended his complaint. Plaintiff alleges that Defendants Falder, Pinkerton and Huffman conspired to harm him in retaliation for filing his civil rights lawsuit. See Dkt. # 88 at 9. He asserts that these defendants purposely denied him a transfer from the G & J unit at DCCC to a minimum security facility, based on his religious beliefs and ethnicity. Id.  Plaintiff contends that the denial of his request for a transfer infringed upon his constitutional rights to equal protection under the law[6] and was a violation of DOC policy. He also claims that the DCCC staff discriminate against him and treat him "funny," citing in particular to incidents which occurred in the summer of 2008.

Defendants seek summary judgment on this issue for several reasons. First, they contend the new allegations are barred by the doctrine of collateral estoppel and for lack of exhaustion. See Dkt. # 98 at 10. They also assert that the new claims do not relate back to the original complaint, as set forth in Fed. R. Civ. P. 15(c) (providing conditions to determine whether an amended pleading relates back to the date of the original pleading for statute of limitations purposes).  Id. at 13-34. Finally, Defendants argue that Plaintiff's claims are based entirely on his own speculation and conjecture and are not supported by facts or the law. Id. at 14-15.

---

[6] As grounds for his equal protection claim, Plaintiff states that other "non-middle eastern inmates" charged with the same crime as Plaintiff are currently housed at minimum security facilities. Dkt. # 88 at 10.

Plaintiff claims Defendants Pinkerton, Falder and Huffman[7] have subjected him to discrimination and retaliation at DCCC because they allegedly denied Plaintiff a transfer to a minimum security facility. However, he has not presented an issue of material fact to defeat Defendants' motion for summary judgment. Plaintiff contends that the denial of his request to be transferred to a minimum security facility was based upon discrimination for his skin color and beliefs. See Dkt. # 88 at 9-10. As support, Plaintiff states that Defendant Pinkerton told him "people up front don't like you because you're a writ writer." Id. at 8. He also claims Pinkerton made joking references to Osama Bin Laden, and told Plaintiff he was a flight risk because it is easier to get to the Emirates from a minimum security facility.[8] Id. at 10. Plaintiff provides an affidavit from inmate Richard Garcia who states that he overheard Defendant Pinkerton make these comments to Plaintiff (Dkt. # 88, Ex. 11). However, even if Defendant Pinkerton made such statements, they do not support Plaintiff's claim that these were the reasons he was denied a transfer. Further, verbal harassment is not sufficient to state a constitutional deprivation under 42 U.S.C. § 1983. See Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979) (verbal harassment by sheriff laughing at prisoner and threatening to hang him following prisoner's request to mail some legal correspondence was not sufficient to state a constitutional deprivation).

---

[7] According to the Supplemental Special Report, Defendants Falder, Huffman and Pinkerton served on the Unit Classification Committee at DCCC which recommended the override for Plaintiff to remain at medium security. Plaintiff was classified medium security and was denied a transfer to minimum security on September 13, 2007, due to gravity of offenses. Defendants acknowledge that Plaintiff was "minimum eligible" but was held at medium security instead of being transferred to minimum on an override. See Dkt. # 99 at 12.

[8] In an affidavit filed as part of the Supplemental Special Report, Defendant Pinkerton denies making any of the statements Plaintiff references. He specifically notes that he would not have said it is easier to get to the Emirates from minimum security as he "was not familiar with the word emirates prior to plaintiff's allegations." See Dkt. # 99 at 69.

Plaintiff also claims that Defendants Falder and Huffman violated DOC policy for discriminatory reasons when they recommended that his transfer request be denied. In support of this argument, Plaintiff claims he met all the DOC criteria for a transfer because he is serving a sentence for a non-violent crime, he has less than 7300 days remaining on his sentence, and his misconduct history does not show any misconducts that would keep him from transferring to a minimum security facility (Dkt. # 88 at 9-10).

In support of their motion for summary judgment, Defendants Pinkerton, Falder and Huffman provide affidavits denying that there was retaliation involved in the classification of Plaintiff, or that his religious affiliation or race were considered in his classification. See Dkt. # 99 at 68, 70, 71.  Defendants also provide a copy of the DOC "Facility Assessment Form" dated September 12, 2007, in which the Unit Classification Committee concludes that although Plaintiff is eligible for minimum security, an override is recommended due to "gravity of offenses." Id., attachment 8. Under the section entitled "discretionary overrides" the committee checked the box stating "Circumstances of the offense." Id. Although originally charged with two counts of first degree murder, Plaintiff plead guilty to two counts of the lesser charge of accessory after the fact. Id. at 63. Further, the DOC inmate profile screening form attached to the committee's decision indicates that Plaintiff has twelve misconducts, a federal conviction to serve after his release from state prison, and an Immigrations and Customs Enforcement ("ICE") detainer in his file. These matters were listed as security considerations in the case manager's recommendation to employ a discretionary override. Id. at 65. Defendants have provided sufficient evidence of the penological reasons for denial of Plaintiff's request to be transferred to a minimum security facility. Plaintiff has

provided no evidence supporting his claim of improper motive that would defeat Defendants' summary judgment motion. <u>Anderson</u>, 477 U.S. at 256-257; <u>Maschner</u>, 899 F.2d at 948 n.4.

As his final claim of conspiracy and retaliation, Plaintiff contends that Defendants Pinkerton, Falder and Huffman supplied two cell phones to a group of Native American inmates in exchange for them to "whoop" the Plaintiff on June 6, 2008. <u>See</u> Dkt. # 88 at 11-12. Defendants assert that Plaintiff has not exhausted administrative remedies regarding the alleged beating on June 6, 2008, or his complaint that Defendant Pinkerton, Falder and Huffman conspired to arrange for the beating in retaliation for filing this § 1983 lawsuit. The only DOC record provided to this Court relating to this issue is Plaintiff's request for medical services dated June 6, 2008, in which Plaintiff wrote "Fell off top bunk busted lip and forehead." <u>See</u> Dkt. # 99, attachment 3. Defendants argue that Plaintiff did not properly exhaust his claims regarding the alleged beating in any grievance proceedings. In response to the motion for summary judgment, Plaintiff's only argument[9] concerning the exhaustion issue is his statement that "[a]t common law a lack of exhaustion does not deprive a Federal court of subject matter jurisdiction." <u>See</u> Dkt. # 109 at 7.

Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  This provision applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes,

---

[9] Plaintiff also states that he accepts defendants' undisputed facts in their motion for summary judgment, unless he cites a number and an explanation. <u>See</u> Dkt. # 109 at 4. Defendants' claim that Plaintiff failed to exhaust administrative remedies is listed as undisputed fact # 16 (Dkt. # 98 at 7). In response to fact # 16, Plaintiff states "Taken up earlier - Opposed." (Dkt. # 109 at 5). The Court finds nothing in his "earlier" arguments addressing exhaustion of administrative remedies.

and whether they allege excessive force or some other wrong." <u>Porter v. Nussle</u>, 534 U.S. 516, 532 (2002). Moreover, exhaustion of administrative remedies under the PLRA is required for all inmates seeking relief in federal district court regardless of the type of relief available under the institutional administrative procedure. <u>Booth v. Churner</u>, 532 U.S. 731, 741 (2001). If the Court determines that the complaint contains only unexhausted claims, the action shall be dismissed without prejudice for failure to exhaust administrative remedies. If the Court determines that the complaint contains both exhausted and unexhausted claims, the unexhausted claims shall be dismissed without prejudice and the Court shall proceed with consideration of the exhausted claims. <u>Jones v. Bock</u>, 549 U.S. 199 (2007).

The Court finds that Plaintiff has not exhausted his claim that Defendants Pinkerton, Falder and Huffman conspired to retaliate against him for filing this lawsuit and arranged for Plaintiff to be beaten by other inmates on June 6, 2008. Accordingly, Defendants are entitled to summary judgment on this claim based on failure to exhaust administrative remedies and the claim shall be dismissed without prejudice.

**B.**    **Plaintiff is not entitled to a declaratory judgment or an injunction**

In addition to his request for monetary damages, Plaintiff seeks an injunction and a declaratory judgment that the Defendants have violated his constitutional rights. The Court has reviewed all of Plaintiff's claims and found no constitutional violations by the Defendants. Accordingly, Plaintiff is not entitled to either an injunction or a declaratory judgment.

**C.**    **Remainder of pending motions are moot**

Because the Court finds Defendants' motion for summary judgment should be granted, Plaintiff's motion for summary judgment (Dkt. # 110) has been rendered moot.

On August 5, 2009, Plaintiff filed a motion for judicial notice regarding problems he is allegedly having with payments to this Court from the state prison system (Dkt. # 120). After filing the motion for judicial notice, Plaintiff has made an additional partial payment(Dkt. # 121). The Court finds that no further action is needed by the Court at this time regarding the payments being made. Accordingly, Plaintiff's motion for judicial notice shall be declared moot. Plaintiff is reminded, however, that he remains obligated to pay the balance owed on the district court and appellate filing fees.  As of today's date, Plaintiff has submitted partial payments totaling $139.26. The balance owed on the $350 district court filing fee and the $455 appellate filing fee is $665.74.

### CONCLUSION

After careful review of the record in this case, the Court finds there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. Therefore, Defendants' motion for summary judgment shall be granted.

**ACCORDINGLY, IT IS HEREBY ORDERED that:**

1. Defendants' motion for summary judgment (Dkt. # 98) is **granted**.

2. Plaintiff's Count 4 claim relating to the June 6, 2008, incident is **dismissed without prejudice** for failure to exhaust administrative remedies.

3. Plaintiff's motion to lift discovery stay (Dkt. # 116) is **denied**.

4. Plaintiff's remaining motions and requests (Dkt. ## 110 and 120) are **declared moot**.

5. A separate judgment shall be entered in favor of Defendants.

DATED THIS 22nd day of October, 2009.

_____
TERENCE KERN
United States District Judge

25